IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO.   ABA-25-0143 |
| | * | |
| PATRICK BRITTON-HARR, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT

On May 8, 2025, a grand jury charged Defendant Patrick Britton-Harr ("Britton-Harr" or "the Defendant") with six counts of wire fraud in violation of 18 U.S.C. § 1343. The Indictment alleges that Britton-Harr engaged in a scheme to defraud certain AeroVanti members of approximately $15 million. *See* Indictment, ECF No. 1, 25-cr-143-ABA.[1]  Now, Britton-Harr comes to the Court seeking to have the charges against him dismissed. But his motion to dismiss the Indictment (ECF No. 46) (the "Motion") falls well short of the applicable legal standard to succeed. It ignores the plain language in the Indictment setting forth the offenses charged pursuant to the statutory framework under 18 U.S.C. § 1343. The Motion also mischaracterizes factual disputes that should be raised at trial as claims of alleged government misconduct before the grand jury. Britton-Harr has not identified any actual government misconduct, nor has he demonstrated the necessary prejudice required to support his contention.

---

[1] Separately, Defendant Britton-Harr was charged with health care fraud, in violation of 18 U.S.C. § 1347, and transactional money laundering, in violation of 18 U.S.C. § 1957, for causing the submission to Medicare of more than $15 million in fraudulent claims for respiratory pathogen panel ("RPP") tests during the COVID-19 pandemic on behalf of a clinical laboratory company he owned called Provista Health, LLC ("Provista"). *See* Indictment, ECF No. 1, 25-cr-144-ABA at ¶¶ 2-5. The tests were medically unnecessary, were not ordered by a treating physician as required, were not actually performed in many cases, and were ineligible for reimbursement. *Id.* at ¶ 23. Defendant Britton-Harr used the fraudulently obtained Medicare funds for personal enrichment, including to purchase a Porsche. *Id.* at 11.

In the alternative, Britton-Harr requests the Court to order the release of grand jury transcripts so that he may "quantify" instances of purported government misconduct. But Britton-Harr offers no legitimate basis for the Court to pierce grand jury secrecy in this case. Nor may the Court order the release of grand jury transcripts to allow the defendant to embark on a "fishing expedition." Accordingly, and for the reasons more fully discussed below, the Court should deny the Motion in full.

## **RELEVANT FACTUAL BACKGROUND**

At trial, the government will present overwhelming evidence of Britton-Harr's guilt, including witness testimony from Britton-Harr's victims and from former AeroVanti employees, documented communications, bank records, and more, laying out Britton-Harr's lies, misrepresentations, and false promises in his effort to defraud the victims of approximately $15 million. In other filings, the government has provided a summary of some of the evidence that it anticipates will be presented at trial. *See* ECF No. 48 (Government's Omnibus Motion in Lime); ECF No.49 (Government's Response to the Motion to Suppress). However, for purposes of this response brief, and considering the standard applied to motions to dismiss, the government's recitation of the facts is limited to what is specifically alleged in the four corners of the Indictment.

In furtherance of the charged wire fraud scheme, Britton-Harr on behalf of AeroVanti entered into lease-purchase agreements for five Piaggio jets starting in November 2021. Indictment at ¶ 4. Thereafter, he caused the creation of a class of AeroVanti "Top Gun" members, who agreed to pay approximately $150,000 each in exchange for certain benefits. *Id.* at ¶ 5. Those Top Gun members were organized as "unitholders" of five limited liability companies ("LLCs"), each of which was established to finance AeroVanti's purported debt-free purchase of

one of the five Piaggio jets.  *Id.* at ¶ 6.  Payments from Top Gun members (the unitholders) to the AeroVanti LLCs totaled approximately $15 million.  *Id.* at ¶ 23.

In furtherance of the scheme to defraud, Britton-Harr misled Individual-1 and Individual-2 [William Leblanc and William Morris] into falsely believing that the Top Gun members' payments would be used to purchase the aircraft and that title to the aircraft would be held in escrow as security for their substantial pre-payment of flight hours.  *Id.* at ¶ 23.  In an email sent on or about February 24, 2022, Britton-Harr represented as follows:

> I agree an escrow arrangement where funds are fully collected and held for each aircraft acquisition group is best.  **Funds can be released at time of closing and lien being filed.**  I had a quick back and forth with our attorney Steve Leitess and got him spooled up.  We are going to chat this morning and respond accordingly with a more formal draft.
>
> Britton-Harr then summarized in the email the required steps to execute the plan:
>
> 1) Establish LLC (~20 Member Units) & Draft Owner Addendum to LLC Member Agreement
> 2) Each Member Unit = 100hrs @ $1500hr ($150,000 Block purchase *~10 = $3MM)
> 3) Set up and fund Escrow
> 4) AeroVanti identify aircraft & purchase aircraft
> 5) **Place LLC Lien on aircraft at closing**
> 6) Issue Stock Warrant at Closing to LLC
> 7) Start Flying

Id. at ¶ 17 (emphases added).

The Top Gun members' payments were held in escrow accounts and disbursement of funds from any of the escrow accounts was restricted to specific purposes, *i.e.*, for the acquisition or reconditioning of the aircraft.  *Id.* at ¶¶ 4-6, 8, 23.  Each of the Top Gun unitholders signed the Member Agreement and the Addendum, which provided the unitholders security for their pre-paid flight hours by requiring AeroVanti to "endorse in blank and deliver to the escrow agent the title

3

to the [specifically designated aircraft]." *Id.* at ¶ 9. The alleged purpose of delivering to the escrow agent title to the aircraft was to provide the unitholders with security for their purchase and to "ensure that AeroVanti maintains insurance and other obligations affecting the airplane and maintains the aircraft in accordance with Part 135 of the Federal Aviation Administration regulations." *Id.* at ¶ 9. AeroVanti further agreed that should it "fail to insure and maintain the [specifically designated aircraft] as required by Part 135, or otherwise materially defaults on its obligations, then Member may declare default" and if the company failed to cure the default," then the LLC could "require the escrow agent to deliver to member the aircraft title documentation as set forth in the escrow agreement." *Id.* at ¶ 9. In other words, in the case of a default, the unitholders would own the planes (i.e. received "aircraft title documentation") as security for their substantial purchase of pre-paid hours.

It was further part of the scheme to defraud that Britton-Harr caused Individual-1 to authorize the disbursal of the approximately $15 million in Top Gun unitholder funds by mispresenting to him that the disbursements were needed to purchase, refurbish, and obtain title to the aircraft. *Id.* at ¶ 21. Britton-Harr concealed that he was using the funds for undisclosed and unauthorized purposes. *Id.* For example, on March 30, 2022, Britton-Harr emailed Individual-1 and Individual-2 regarding the need for unitholder funds to purchase aircraft with tail number 44Z. Britton-Harr wrote, "I spoke with the seller and with the current list of participating members for 44Z, **the amount ($825k) of deposits will allow for the title to be released and we can close**. We can then allow for a rolling close for the additional participating members to join but this way we have secured the aircraft." *Id.* at ¶ 18 (emphasis added). In truth and fact,

4

$825,000 of the 44Z unitholder funds were not used to "close" on the aircraft and "title" was not "released" at that time.

Instead of using the escrow funds as he represented, Britton-Harr diverted the approximately $15 million in funds for unauthorized purposes. *Id.* at ¶¶ 13, 26. For example, on or about May 27, 2022, Britton-Harr diverted $100,000 of Top Gun unitholder funds to a personal bank account, after which he spent approximately $65,000 of Top Gun unit holder funds at a jewelry store. Between June and September 2022, Britton-Harr misappropriated over $500,000 in Top Gun unitholder funds to purchase three boats, including spending over $300,000 on a yacht. *Id*. at ¶ 26.

In or around April 2023, Britton-Harr later attempted to conceal his scheme by borrowing $1.5 million from investors to purchase an aircraft with tail number N290BC, which was one of the five aircraft that Britton-Harr had falsely claimed to have purchased with Top Gun unitholder funds. Britton-Harr misled the investors into providing the loan, by, among other means, concealing both the existence of the LLC previously created to purchase the plane and that he had already been sued by N290BC's owner for repossession of the aircraft. *Id.* at ¶ 28.

## ARGUMENT

I. **The Indictment's Allegations, Which Must Be Accepted as True, Properly Set Forth the Offenses Charged.**

Britton-Harr fails to satisfy his burden to show that the allegations contained in the Indictment, "*even if true*, do not establish the crimes charged . . . ." *United States v. Treacy*, 677 Fed. App'x 869, 873 (4th Cir. 2017) (emphasis added). First, by citing to records outside the four corners of the Indictment as support for his argument (*see, e.g.*, ECF No. 46 at 15), Britton-Harr ignores the basic legal standard that a challenge to the sufficiency of the indictment "is ordinarily

limited to the allegations contained in the indictment" and may not involve consideration "of facts that should have been developed at trial." *Treacy*, 677 Fed. App'x at 873 (citing *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012)). Second, the Indictment properly alleges that Britton-Harr intentionally engaged in wire fraud.

"It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the [offense] intended to be punished." *United States v. Frost*, No. 21-4240, 2022 U.S. App. LEXIS 11174, at *2 (4th Cir. Apr. 25, 2022) (citing *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014) (internal quotation marks omitted)). This is because the purpose of the indictment is "to put the defendant on notice of the charge against [him], not to demonstrate that the Government has sufficient facts to convict the defendants." *United States v. Elbaz*, 332 F. Supp. 3d 960, 970 (D. Md. 2018). "[A]n indictment must merely identify those essential facts necessary to inform [the defendant] of the charge, prepare a defense, and avoid double jeopardy, not lay out the whole of the Government's case." *Id.* (internal citation omitted). The instant Indictment more than meets this bar.

To convict a person of the crime of wire fraud, the government must show that the defendant "(1) devised or intended to devise a scheme to defraud and (2) used . . . wire communications in furtherance of the scheme," and that the defendant "specifically intend[ed] to lie or cheat or misrepresent with the design of depriving the victim of something of value." *United States v. Wynn*, 684 F.3d 473, 477-78 (4th Cir. 2012).

Paragraph 12 of the Indictment alleges that from at least November 2021 through at least October 2023, Britton-Harr "knowingly devised and intended to devise a scheme and artifice to

6

defraud Top Gun unitholders, to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and transmitted and caused to be transmitted by means of wire communications in interstate commerce, writings, signals, pictures and sounds for purpose of executing such scheme and artifice to defraud." Indictment at ¶ 12. As such, the Indictment states all the elements of a wire fraud offense.

The allegations in the Indictment track the statutory text of 18 U.S.C. § 1343 and include "essential facts constituting the offense charged . . . ." *Perry*, 757 F.3d at 171. For example, the Indictment alleges that Britton-Harr's scheme was to defraud Top Gun unitholders, and that it occurred between November 2021 through at least October 2023. Indictment at ¶ 12. Paragraph 13 describes the purpose of the scheme to defraud as being for Britton-Harr to "fraudulently obtain funds from Top Gun unitholders" and to "divert those funds for unauthorized and undisclosed purposes, including his own personal benefit." Indictment at ¶ 13. And Paragraphs 14 through 28 detail the specific manner and means which Britton-Harr used to carry out the alleged fraud scheme, including, for example, "by falsely representing and by misleading Individual-1 into falsely believing, that the money would be used to purchase, refurbish, and obtain title to specific aircraft, and by concealing his intent to divert the funds for unauthorized and undisclosed purposes." Indictment at ¶ 21. Paragraph 29 of the Indictment further alleges the approximate date and a description of the interstate wire for each charged count, including the transmittal and receipt locations for each wire. Indictment at ¶ 29. These facts are more than sufficient to state the elements of the offense—including as to the element of specific intent—and to provide notice of the charges against Britton-Harr. *See United States v. Elbaz*, 332 F. Supp. 3d 960, 970-71 (D. Md. 2018) (denying a challenge to the sufficiency of an indictment charging wire fraud on the

grounds that the indictment "states all of the elements of the offense and provides notice of the charges against" the defendant.); *see also United States v. Loayza*, 107 F.3d 257, 261 (4th Cir. 1997) (while the defendant "understandably wants the government to disclose its theory of the case and the supporting evidentiary facts . . . [t]hat is not and never has been required at the indictment stage.") (internal citation omitted).

## II.     Britton-Harr's Claims Regarding Alleged "Misstatements" in the Indictment are Baseless, but in any Event Relate to the Merits of the Charges.

Britton-Harr asserts that "misstatements" in the Indictment "had the legal effect of attempting to provide" two elements of wire fraud—a "scheme to defraud" and "materiality" and that "[b]y not carefully crafting an indictment with precise wording or leaving out certain portions contained in a legally binding contract or flat out misstating as fact that which is not a fact at all will have the effect of confusing a grand jury." ECF No. 46 at 11-12.[2] Fundamentally, the Defendant disagrees with the allegations in the Indictment and seeks to present his defense to these charges through this Motion. *See* ECF No. 46 at 2-10. But the fact that the Defendant disagrees with the Indictment's allegations does not mean that "misstatements" were provided to the grand jury. If that were so, the motion to dismiss standard would be turned on its head, allowing defendants to require the Court to give improper and full consideration to the merits of the case before trial. *See United States v. Vanderhorst*, 2 F. Supp. 3d 792, 803 (D. S. C. 2014) (A

---

[2] Britton-Harr cites to *United States v. Goodwin*, 272 F.3d 659, 666 (4th Cir. 2001) for the proposition that the first element of wire fraud (a "scheme to defraud") meant that he acted with a "specific intent" to defraud. (ECF No. 46 at 11). But *Goodwin* is not relevant to the instant case. The defendants in *Goodwin* were convicted of mail fraud in violation of 18 U.S.C. § 1341, and their convictions were upheld based on the sufficiency of the evidence. *Id.* at 663, 666.

defendant "is not permitted, at this preliminary stage, to try the merits of his case based on the allegations in the Indictment.").

Britton-Harr twists factual disputes reserved for the provenance of the jury by claiming, for example, that the Indictment wrongly alleges that he misrepresented to Top Gun members that he would execute a "rolling close" to purchase and obtain title to aircraft and argues that the "rolling close" in fact was meant to purchase flight hours for AeroVanti members. ECF No. 46 at 12-13. Likewise, Britton-Harr asserts that the Indictment wrongly alleges that he "did not use any of the money to purchase any aircraft" because "part of the escrowed money was used to pay the monthly lease purchase agreement and for repairs to the fleet of several planes AeroVanti subject to the lease purchase agreements." ECF No. 46 at 14.

These alleged "misrepresentations" set forth in the Motion are not "misrepresentations" at all; instead, they are Britton-Harr's gloss on factual issues such as unitholders' understanding of the five LLCs' structure and purpose based upon Britton-Harr's representations to them, the permitted use of escrowed funds, and how the proceeds of those funds were used upon disbursement from escrow. While the government certainly does not agree with any of Britton-Harr's characterizations of the evidence, the time to dispute it will be at trial, where the government intends to introduce evidence through, *inter alia*, witness testimony, e-mail and text message communications, business records (including, for example, Top Gun Membership Agreements, Escrow Agreements, and disbursal instructions), and financial records, that will prove beyond a reasonable doubt that Britton-Harr is guilty of the charged offenses. This evidence will show that:

1) Britton-Harr represented or caused to be represented to prospective Top Gun members that the purpose of each of five LLCs was to finance AeroVanti's purported debt-free purchase

and refurbishment of one of five Piaggio jets. Witnesses will testify that the purpose of the arrangement was to enable AeroVanti to outright own the planes, rather than maintain a lease interest.

2) Britton-Harr set up or caused to be set up a structure whereby unitholders in each LLC provided funds to an account maintained by an escrow agent, which were to be used only for specific purposes, primarily the purchase or reconditioning of a specifically designated aircraft by AeroVanti. Britton-Harr represented or caused to be represented that in exchange for supplying these funds, unitholders received prepaid "block time hours" to use and fly on AeroVanti planes. As security for those funds, Britton-Harr represented that "title" would be transferred from the seller of the plane to be held in escrow. That way, if AeroVanti defaulted on its agreement, the Top Gun unitholders would have something in value to recoup (i.e. ownership of an aircraft).

3) From the outset, Britton-Harr did not intend to use unitholders' funds for the specific purposes set forth in the Top Gun Membership Agreement. His knowingly false representations to prospective Top Gun members/LLC unitholders were material to their decisions to provide approximately $15 million in funds to AeroVanti for the purported purchase of five Piaggio jets.

4) Britton-Harr repeatedly lied to Individual-1, and others, to cause the release of unitholders' escrowed funds. Britton-Harr represented that disbursements were needed to purchase and/or recondition specifically designated aircraft, and that title to the aircraft would be delivered to the escrow agent as security for unitholders' pre-paid flight hours.

5) Instead of using the escrow funds as represented, Britton-Harr diverted approximately $15 million in funds for unauthorized purposes. Bank records will demonstrate that none of the unitholder funds were used to purchase any of the five aircraft. Witnesses will testify that the aircraft were not refurbished to Part 135 standards, and that certain of them were regularly out of service. The airplane with tail number N111VR, for which approximately $3 million in escrow funds were released, was only used as a "parts plane" – that is the aircraft could be cannibalized for parts to be used on other aircraft, and was not itself airworthy, let alone refurbished to Part 135 standards.

6) Additionally, analysis of the bank records reveals that Britton-Harr used the funds for personal enrichment, including the purchase of boats, a racing yacht, jewelry, and rent expenses for a luxury home.

Ultimately, Britton-Harr may subject the government's witnesses to cross-examination and challenge the government's evidence during its case-in-chief. But the proper forum to do so is at trial, when a jury will resolve factual disputes upon full consideration of the admissible evidence. By contrast, the Court cannot adequately consider the merits of the case upon a motion to dismiss the Indictment. *Vanderhorst*, 2 F. Supp. 3d at 803. Nor should it do so here, despite Britton-Harr's request otherwise.

Britton-Harr also claims that the Indictment "fail[ed] to quote the entirety of the permitted use of the escrowed funds" to include the "use of the aircraft . . . ." ECF No. 46 at 12 referring to Indictment at ¶ 8. But Britton-Harr's assertion is premised upon speculation that the grand jury was not presented with the full language of the Membership Addendum. Just because the Indictment does not include mention of a particular document or statement does not mean that the

grand jury was not aware of such information.  Mere conjecture to the contrary is not a basis to pierce grand jury secrecy.  Also, *even if* the entirety of the permitted use of the escrow funds were not presented to the grand jury, it is well established that "[a] defendant must show more than just omission of evidence during grand jury testimony to justify dismissal."  *See United States v. Muhammad*, No. 08-cr-1237, 2011 U.S. Dist. LEXIS 77968, at *24 (D. S.C. July 18, 2011) (citing *United States v. Casas*, 425 F.3d 23, 38 (1st Cir. 2005) (declining to dismiss the indictment absent evidence that "the prosecutor knowingly presented false testimony.")).  Indeed, even "a failure to present exculpatory evidence to the grand jury is insufficient to warrant dismissal."  *Id.* (citing *United States v. Neely*, 966 F.2d 1445 (4th Cir. 1992)).

Britton-Harr has not identified any actual "misstatements" to the grand jury.  Rather, his Motion merely is a vehicle to present his view of the case.  But that must wait for trial.  Accordingly, the Motion is baseless and should be denied.

## III. Britton-Harr Does Not Satisfy the Legal Standard for Dismissal of an Indictment Involving Purported Misstatements.

Even were the Court to accept his speculation that "misstatements" were made to the grand jury, Britton-Harr cannot satisfy the threshold legal standard for dismissal that the parties agree applies.  *See* ECF No. 46 at 11 (citing *United States v. Mechanik*, 475 U.S. 66, 78 (1986)).  That standard requires the Defendant to show that any alleged "misstatements" "*substantially influenced* the grand jury decision to indict," or that "there is '*grave doubt*' as to whether it had such effect."  *Mechanik*, 475 U.S. at 78 (emphasis added) (requiring the defendant to show that a violation of grand jury secrecy resulted in "grand jury intimidation or improper influence on important witnesses' testimony and thus had a 'substantial influence' on the indictment returned, or that there is grave doubt as to whether it had such effect.").  But dismissal under these

circumstances is limited to extraordinary cases involving deliberate and manifest prosecutorial conduct, such as perjured testimony, improper influence, or grand juror intimidation. *Id.*; *Muhammad*, 2011 U.S. Dist. LEXIS 77968, at *23 (requiring the defendant to show that the government "knowingly used perjured testimony in order to get the grand jury to return an indictment against him and that absent the perjury, he would not have been indicted.") (citing *United States v. Thomas, 19 F.3d 1431, *2* [published in full-text format at *1994 U.S. App. LEXIS 5123*] (4th Cir. 1994) and *Bank of Novia Scotia v. United States*, 487 U.S. 250, 256 (1988)); *United States v. Mann*, 140 F. Supp. 3d 513, 539 (E.D.N.C. 2015) (requiring defendant to show "actual prejudice" for a court to dismiss an indictment for "irregularities in the grand jury proceeding."). It does not apply to a disagreement over the fact of an indictment or the allegations contained within. Allowing such assertions to serve as the basis for dismissal would require the Court to treat every motion to dismiss that challenges the government's view of the evidence as a "motion for summary judgment" involving full-fledged consideration of the merits before trial.

Britton-Harr does not show that any alleged misstatements substantially influenced the grand jury decision to indict, or that there is "grave doubt" that the decision to indict was free from substantial influence of such misstatements. He merely hypothesizes that the alleged misstatements "will have the effect of confusing a grand jury." This is not sufficient to warrant dismissal of the Indictment, *even* were Britton-Harr's claims regarding the alleged misstatements true, which they are not. *See, e.g., Mann*, 140 F. Supp. 3d at 539 (denying the defendant's motion to dismiss indictment even though the government introduced inaccurate testimony to the grand jury because the defendant was unable to show that "the government's actions were undertaken in bad faith or that they substantially influenced the grand jury's decision to indict . . . .").

Britton-Harr makes several claims in support of his argument, including, *inter alia*, that the alleged misrepresentations were designed: "to draw an inference that Mr. Britton-Harr was engaged in a fraud scheme and had the specific intent to defraud" (ECF No. 46 at 12); "to infer Mr. Britton-Harr was attempting to defraud AeroVanti's members" (ECF No. 46 at 12); or "to make it look as if Mr. Britton-Harr had lied to them and tricked them into becoming members and tricked them into enticing them to seek out additional members," (ECF No. 46 at 13). Of course the government presented evidence to the grand jury that Britton-Harr engaged in a fraud scheme and had intent to defraud, that he was attempting to defraud Top Gun members, and that he lied and tricked them into becoming members. And the grand jury agreed based on the government's presentation that probable cause existed that Britton-Harr committed the offenses charged. The very purpose of trial is to allow Britton-Harr to confront and challenge the government's case, to the extent he disagrees with the charges against him.

### IV. Britton-Harr's Request in the Alternative for Disclosure of Grand Jury Transcripts Should be Denied

Without offering any basis or legal authority, Britton-Harr requests, in the alternative, for the Court to order release of the "applicable grand jury transcripts for the defense to further quantify the full scope of all misrepresentations." (ECF No. 46 at 17). But "grand jury proceedings are entitled to a strong presumption of regularity," and Britton-Harr bears a "heavy burden" of showing that "particularized and factually based grounds exist to support the proposition that irregularities in the grand jury proceedings may create a basis for dismissal of the indictment." *United States v. Mosby*, No. 22-cr-00007, 2022 U.S. Dist. LEXIS 166762, at *17 (D. Md. Sept. 14, 2022) (citing *United States v. Loc Tien Nguyen*, 314 F. Supp. 2d 612, 616 (E.D. Va. 2004)). He does not meet this burden.

Grand jury secrecy is governed by **Error! Bookmark not defined.**Federal Rule of Criminal Procedure 6(e) and by more than a century of jurisprudence holding that the reasons for grand jury secrecy are "compelling," given that the grand jury is a cornerstone of the criminal justice system, holding a "'high place . . . as an instrument of justice.'" *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959) (quoting *Costello v. United States,* 350 U.S. 359, 362 (1956)). "To make public any part of its proceedings would inevitably detract from its efficacy," as "[g]rand jurors would not act with that independence required of an accusatory and inquisitorial body." **Error! Bookmark not defined.***Id.*; see also *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979) ("We consistently have recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings.").

Pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), this Court may authorize disclosure of the grand jury transcripts "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." But because the proper functioning of a federal grand jury depends upon the secrecy of the proceedings, the "indispensable secrecy of grand jury proceedings must not be broken except where there is a compelling necessity." *United States v. Procter and Gamble Co.*, 356 U.S. 677, 682, (1958) (internal citations omitted); *United States v. Stuck*, 227 Fed. App'x 219, 222-23 (4th Cir. 2007). The party seeking disclosure must show: "(1) that the grand jury materials requested here are necessary to avoid injustice in another proceeding; (2) that the need for disclosure outweighs the need for continued secrecy; and (3) that the request is tailored to cover only the necessary materials." *United States v. Johnson*, No. JKB-98-259, 2024 U.S. Dist. LEXIS 79168, at *4 (4th Cir. April 29, 2024) (citing *United States v. Moussaoui*, 483 F.3d 220, 235 (4th Cir. 2007)).

15

"[S]peculative, generalized allegations of misconduct are insufficient to justify disclosure." *Id.* (citing *United States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir. 1980) ("Mere 'unsubstantiated, speculative assertions of improprieties in the proceedings' do not supply the 'particular need' required to outweigh the policy of grand jury secrecy.")).

Even where a party makes a "plausible showing" of a particularized need for grand jury materials, *in camera* review is the appropriate course prior to disclosure to the Defendant. *See United States v. King*, 628 F.3d 693, 703 (4th Cir. 2011) (defendant's "plausible showing" of possible exculpatory information was "sufficient to trigger such an *in camera* inspection."). Such review protects the "Government's interest in maintaining the secrecy of the grand jury and its witnesses." *United States v. Martinez*, No. 18-cr-123-2, 2021 U.S. Dist. LEXIS 86333, at *49-50 (E.D. Va May 5, 2021). "[J]udges have long enjoyed wide discretion to inspect grand jury testimony where a particular need is shown, in part because the *in camera* procedure effectively safeguards the government's interest in the preservation of grand jury secrecy." *King*, 628 F.3d at 703 n.5 (internal quotations and citations omitted).

"Conclusory or speculative allegations of misconduct" such as those contained in the Motion and addressed more fully above are not grounds for the release of grand jury materials. *See Johnson*, 2024 U.S. Dist. LEXIS 79168, at *4; *Loc Tien Nguyen*, 314 F. Supp. 2d at 616. Nor may the Defendant seek disclosure of grand jury transcripts to "quantify the full scope of all misrepresentations" and embark on a "fishing expedition to search for grand jury wrongdoing and abuse." *Loc Tien Nguyen*, 314 F. Supp. 2d at 616. Because Britton-Harr makes no plausible showing of a particularized need for grand jury materials, *in camera* review of the proceedings also is not warranted.

## **CONCLUSION**

      For the reasons set forth above, Defendant Britton-Harr's Motion to Dismiss the Indictment should be denied in full.

                                        Respectfully submitted,

                                        Kelly O. Hayes
                                        United States Attorney
                                        District of Maryland

                                        Lorinda I. Laryea
                                        Chief, Fraud Section
                                        United States Department of Justice


                                        By: /s/ Ariel Glasner
                                        Ariel Glasner
                                        Trial Attorney
                                        U.S. Department of Justice, Criminal Division
                                        Fraud Section
                                        1400 New York Avenue, N.W.
                                        Washington, D.C., 20005

                                        Ari D. Evans
                                        Assistant United States Attorney
                                        United States Attorney's Office
                                        District of Maryland

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *   CRIMINAL NOS.   ABA-25-0143 |
| | * |
| PATRICK BRITTON-HARR, | * |
| | * |
| Defendant. | * |
| | * |
| | ******* |

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2026, I filed the foregoing with the Clerk of the District Court using the CM-ECF system.

By:   */s/ Ariel Glasner*
      ARIEL GLASNER
      Trial Attorney