**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA     *

     v.     *     Case No. ABA-25-0143

  PATRICK BRITTON-HARR     *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>**NOTICE OF ADVICE OF COUNSEL DEFENSE**</u>

Following briefing on the issue of a possible advice of counsel defense by the Defendant, the Court issued its Order on April 28, 2026, requiring the defense to file a Notice as to whether it intends to advance this defense. ECF 69. The Court also ordered that should the Defendant choose to advance such a defense it must include in its Notice "the minimal prima facie evidence to satisfy his burden of production as set forth in *Westbrooks,[1]* including '(a) full disclosure of all pertinent facts to an attorney, and (b) good faith reliance on the attorney's advice.'" Order at page 5.

This pleading follows.

**1.    Full Disclosure of all Pertinent Facts to An Attorney.**

The defendant will prove that an attorney/client relationship existed between the defendant and the law firm of Silverman Thompson Slutkin and White as it relates to the

---

[1] The cite noted is <u>United States v. Westbrooks</u>, 780 F.3d 593 (4th Cir. 2015).

numerous legal and business issues in its representation. Specifically, Steven Leitess, Esquire, was a senior member of the firm and Chair of the Business and Finance Practice Group as well as Gordon Young, Esquire and worked directly on the AeroVanti file in that office.

The defense would expect to call Mr. Leitess as a witness to provide evidence in many areas in which he provided legal advice and services in the event the government elects not to call him in its case-in-chief.[2]

Although it is not anticipated that the government would challenge the fact that an attorney/client relationship existed between Mr. Leitess and Mr. Young and Mr. Britton-Harr, all exhibits demonstrate the existence of the relationship throughout the relevant time at issue as set forth in the indictment.

Unlike the fact pattern in Westbrooks, or found in United States v. Dallman, 433 F.Supp 3d. 804 (E.D.Va. 2020), cited in the Court's Order, the services of Mr. Leitess continued for at least three years and contained numerous face-to-face visits, extensive telephone communications and virtually hundreds of email communications. The legal and business issues

---

[2] When a defendant advances an advice of counsel defense, the attorney/client privilege attendant to this relationship is presumptively severed, permitting the government to call that attorney as its own witness and seeking answers to questions that would otherwise be protected. Mr. Britton-Harr is aware that the Court may find he has waived his attorney/client privilege.

assigned to him were beyond numerous. The following are set forth to establish full disclosure of facts pertinent to pertinent issues inherent in this case. They are essentially in chronological order from the earliest date found on the last page of each exhibit moving to the front page. The Court will note that the exhibits will have space on the last page of the email chain chronology. Counsel excised the communication between myself and my investigator or Mr. Britton-Harr and in so doing it created the space.

**Exhibit 1 –** The first email was written by Mr. Leitess to the Howard Bank on April 29, 2021, acknowledging a meeting with Roxanne Roloff, a Vice President at Howard Bank. Mr. Leitess emailed later in the evening stating that there would be a need for a domestic wire transfer in the amount of $50,000 the following morning. The email chain shows Mr. Leitess is discussing with Ms. Roloff and Mr. Bamberger also from Howard Bank getting AeroVanti set up for on-line banking ("OLB"). Mr. Leitess sends to her Mr. Britton-Harr's OLB Form, his OLD form and the AeroVanti Wire Transfer Agreement. On April 30, 2021, a second Howard Bank employee sends Mr. Leitess a list of costs associated with on-line banking. Several additional emails from Howard Bank concerning on-line banking are sent to Mr. Leitess without his responding. Mr. Britton-Harr is not copied on any of these emails.

**Exhibit 2 —** This email dated July 6, 2021, is from Mr. Leitess to Mr. Britton-Harr and Mr. Leitess advises that Mr. Britton-Harr needs to execute the OLB form and he "handled the wire transfer agreement" and that the wire transfer agreement will permit "the company to be able to initiate wires using dual approval security."

**Exhibit 3 —** At the back of the exhibit is a copy of the OLB form executed by Mr. Britton-Harr on July 8, 2021. It demonstrates that wire transfers will require two people to authorize any transfers from the account ending in 4642. Following is a Certification/Resolution (unsigned) that Mr. Leitess is authorized to participate in the dual approval security. The next document is Mr. Britton-Harr's executed Wire Transfer Agreement. These documents were returned by Mr. Britton-Harr to Mr. Leitess. Mr. Britton-Harr did not play any role in the production of those records.

**Exhibit 4 —** On July 16, 2021, Mr. Leitess sent an email to Howard Bank advising he had his OLB set up, but Mr. Britton-Harr hadn't at that point. He states "the AeroVanti account requires each of us to approve outgoing wires." He also advised Ms. Barge from the bank that the transfer's amount and routing numbers and that "the message/purpose should be 'AeroVanti Easton hanger rent July Aug 2021.'" Mr. Leitess demonstrated clearly that

every disbursement would have a notation as to the purpose for the disbursement noted on the wire transfer.

**Exhibit 5 –** This is an email to William LeBlanc where he acknowledges "I rewrote Section 1(d) per our most recent email correspondence." This email demonstrates Mr. Leitess was solely responsible for the language of the Addendum to the Member Agreement Section 1(d). It shows also that he had sent a copy of the "Block Time Use of Funds Agreement." None of these documents were prepared by Mr. Britton-Harr.

**Exhibit 6 –** This email dated April 1, 2022, sent by Mr. Leitess to Jack Gilchrist, the owner of Gilchrist Aviation Law, P.C. is a request for the escrow balance and "the form of release of funds certification for the parties to complete." Ms. Grayson responded by advising Mr. Leitess of the current escrow balance and asks if he wants them to prepare a form for release of funds.

**Exhibit 7 –** This is the Escrow Agreement that defined the responsibilities of Gilchrist as the escrow agent for all the LLCs. This agreement concerns the0 44Z LLC. Each LLC signed the Agreement. It is signed by Mr. Britton-Harr and Mr. William LeBlanc, the managing member, and Jack Gilchrist. Mr. Leitess is copied on Attachment 1 of the Agreement. Finally, this exhibit has a DocuSign attached to this 44Z,LLc that shows that Mr. Leitess is copied on all DocuSigned documents and the Electronic

Record and Signature Disclosure outlines the rules concerning DocuSign. This document was the document used to determine how disbursements from the Escrow Agent was to work.

    **Exhibit 8 –** This email chain begins on April 4, 2022, Mr. Leitess responds to an inquiry from Mr. Gilchrist if they should create a Disbursement Instruction document by urging Gilchrist to do so and emphasizes AeroVanti's "need to move money today." The following email dated April 4, 2022, at 4:47 p.m. from Jack Gilchrist is addressed to Mr. Leitess. In it Mr. Gilchrist states, he is aware that Mr. Leitess spoke with Kayla Grayson earlier in the day but goes on to say, "(H)owever, I continue to be somewhat uncertain about whether we are able to release funds prior to our receipt of the $2,250,000 referenced in paragraph 1d(i) of the Addendum to AeroVanti Membership Agreement." He indicates further that "I know our team is confirming to you as we receive funds…" He advises Mr. Leitess that his company does "not yet have sufficient funds to  purchase MSN 1089 under the terms of the Aircraft Lease Purchase Agreement with Endless Mountains Properties LLC." Finally, Mr. Gilchrist asks Mr. Leitess, "(I)f your understanding is that we are to be authorized to release funds before we have the $2.25m can you help me understand where this would be the understanding of these depositing Unit Holders?" The following email sent on April 5, 2022, at 11:11 a.m. is from Mr. Gilchrist to Mr.

Leitess where Mr. Gilchrist wrote, "(I)n follow up to our phone conversation regarding the release of funds from escrow…" He attached a copy of a draft disbursement instruction that he thought would work. Later in the day following another telephone call between the two, a final disbursement instruction is sent to Mr. Leitess. Mr. Britton-Harr also responded to Mr. Gilchrist confirming that Gilchrist fees should be taken with the next disbursement. In the last email in this chain, Mr. Gilchrist thanked Mr. Britton-Harr for confirming the fee matter and states that $675,000 was held in escrow at the time and after Gilchrist fees were paid $662,000 was sent to AeroVanti. Mr. Leitess was copied on the email. These emails demonstrate Mr. Leitess is very active in the issues of money being deposited into the AeroVanti account from escrow given his many telephone calls with Gilchrist employees; he was instrumental in the establishment of the language used in Section 1(d); he set up the Wire Transfer Agreement that established a dual authorization protocol for each disbursement; he wanted and received notice of every disbursement from AeroVanti with the amount and destination and purpose of the disbursement; he knew that the planes were subject to a lease purchase agreement and no plane could be quickly paid off.

**Exhibit 9 –** These documents are Escrow Agreement Disbursement Instructions "(F)or purposes of disbursement

7

instructions under that certain Addendum to AeroVanti Membership Agreement for Purchase of Block Time Flight Hours…" for May 27, 2022 (Member 90BC, LLC); Escrow Agreement Disbursement Instructions "(F)or purposes of disbursement instructions under that certain Addendum to AeroVanti Membership Agreement for Purchase of Block Time Flight Hours for June 23, 2022 (Member N189LW, LLC); Escrow Agreement Disbursement Instructions "(F)or purposes of disbursement instructions under that certain Addendum to AeroVanti Membership Agreement for Purchase of Block Time Flight Hours for August 26, 2022 (Member N111VR, LLC); Escrow Agreement Disbursement Instructions "(F)or purposes of disbursement instructions under that certain Addendum to AeroVanti Membership Agreement for Purchase of Block Time Flight Hours for September 15, 2022 (Member N111VR, LLC). Mr. Leitess received notice of every distribution of funds from Gilchrist to AeroVanti. These are representative of the Instructions and Mr. Leitess' name is on the DocuSign documents that show he is copied.

**Exhibit 10** – Mr. Britton-Harr requests the escrowed funds be paid over on May 9, 2022. On the next day, Mr. Leitess writes Mr. Britton-Harr and others advising them to "initiate the wire for all the funds presently in escrow except only (D.B's.) while the company works on assembling those." Mr. Leitess is acutely

aware of the status of each member and potential member's status.

**Exhibit 11 –** This email chain begins on June 13, 2022, with Mr. Leitess writing to William LeBlanc and Wiliam Morris with a copy to Mr. Britton-Harr and Gordon Young, another attorney from the Silverman Thompson firm working on the AeroVanti matter. Either Mr. Young or Mr. Leitess prepared an operating agreement for the "block time project" to be used by all the LLCs managed by Mr. LeBlanc. Mr. Leitess advised the two gentlemen that his representation of Mr. Britton-Harr and AeroVanti while assisting them "presents a potential for conflict of interests." He requested their acknowledgement. Mr. LeBlanc responded and indicated there would be a couple of changes in the proposed document. On June 15, 2022, Mr. Leitess responded and wrote that he and Mr. Le Blanc reviewed the document and he "made the adjustment he and Bill M. identified." He also identified additional legal work his office would accomplish on behalf of the parties.

**Exhibit 12 –** On July 1, 2021, Mr. Leitess emailed Mr. Bamberger from Howard Bank and advised him he would "get the wire docs back to you pronto" to pay some bills. Later in the day Mr. Bamberger asked if Mr. Leitess was "set up to view the account on-line?" he also noted that "(W)e now require dual Control for all on-line wires (is one person Initiates and

another Approves). You can opt out…" Shortly thereafter, Mr. Leitess responded by writing, "I like the dual control. Yes, I can get in via my Browser and my iDevices. So can Patrick." This demonstrates that Mr. Leitess is a primary person to check on money coming into Gilchrist, money coming into AeroVanti from Gilchrist and money leaving the AeroVanti account.

**Exhibit 13 –** On August 31, 2022, Mr. Leitess and Mr. Britton-Harr discussed whether a certain disbursement should be paid. It was a misspelling of Troy Britton-Harr who was owed money by AeroVanti but the disbursement was spelled "Britton-Garr". They discussed if it should be denied and Mr. Britton-Harr told Mr. Leitess not to bother. The point is that Mr. Leitess sees where the actual place disbursements are going and when disbursements are made from AeroVanti for wire payments.

**Exhibit 14 –** This exhibit demonstrates that Mr. Leitess authorized three distributions from AeroVanti to the Tampa Buccaneers on December 9, 2022, December 12, 2022, and January 9, 2023, totaling $775,000. These monies were used to advertise and expand AeroVanti's membership by AeroVanti purchasing a sponsorship agreement with the Tampa Buccaneers where potential members and executives from companies who might need a private carrier for air travel were invited. Mr. Leitess used the suite on multiple occasions and saw how the suite was being used.

10

**Exhibit 15 –** This exhibit is a text chain between Mr. Britton-Harr and Mr. Leitess where the yachts known as the Triple Lindy and Casino Royale were discussed. The Triple Lindy is noted in the indictment. It is very clear that Mr. Leitess was very much involved in the purchase of the yachts as well as the preparation of and/or reviewing of the documents necessary for the transfer of the ownership of the yachts. At page 2 of this exhibit, Mr. Leitess notes "I've been knocking off to-do's for Casino Royale with our Maltese attorneys. I think I have everything I need now, except the money!" As with all Mr. Britton-Harrs AeroVanti transactions, he communicated with Mr. Leitess about how to proceed. These yachts were no exception.

These Exhibits demonstrate that Mr. Britton-Harr made all pertinent facts known to Mr. Leitess as it relates to the charged conduct. He advised Mr. Leitess of how planes would be purchased through lease-purchase agreements, leases that it is believed were prepared in part by Mr. Leitess or his staff. He advised him that the Top Gun members were purchasing flight hours not planes. Indeed, it was AeroVanti that was purchasing planes, albeit it by lease-purchase agreements. He told Mr. Leitess where the money derived from Gilchrist was going. Mr. Leitess, of course, knew where the money was going since all wired payments of any kind required dual permission to be paid.

**2. Good Faith Reliance on the Attorney's Advice.**

The same documents also prove that Mr. Britton-Harr relied upon the advice of Mr. Leitess to guide Mr. Britton-Harr in the creation of AeroVanti's Top Gun program. It is apparent that Mr. Britton-Harr depended upon the advice given to him. It is apparent that Mr. Britton-Harr depended upon Mr. Leitess in the creation of nearly all the documents needed for Top Gun to be operational. Mr. Gilchrist, also an attorney, also prepared documents as demonstrated by the exhibits. Mr. Young, also an attorney, who is copied on some of the exhibits, worked on AeroVanti in the preparation of documents. Collectively they demonstrate that Mr. Britton-Harr depended upon their advice and he always followed it.

Good faith belief is shown in that Mr. Britton-Harr's interactions with the attorneys were reactive. As the exhibits show from 2021 to 2023, when the attorneys communicated ideas and strategies Mr. Britton-Harr did not balk or attempt to divert the attorneys in a direction that would assist him in the perpetration of the alleged fraud scheme. Instead, he may have asked questions but he always acted in conformity with the advice given to him.

## Conclusion

The Court should find that Mr. Britton-Harr has made a *prima facie* showing to permit him to produce evidence and make argument that his actions were made with the advice of counsel.

Respectfully Submitted,

/S/ Gerald C. Ruter

_____
Law Offices of Gerald C. Ruter, P.C.
9411 Philadelphia Road, Suite O
Baltimore, Maryland 21237
(410) 238-8000
Ruterlaw@verizon.net

## Certificate of Service

I hereby certify that this document was on this 4th day of May 2026, delivered to all counsel of record by CM/ECF.

/s/ Gerald C. Ruter

_____
Gerald C. Ruter